UNITED STATES of America, Appellee,

v.

Malcolm Eugene RATLIFF, Appellant.

No. 80–1077.

United States Court of Appeals,
Eighth Circuit.

Submitted May 23, 1980.

Decided June 27, 1980.

Dale Price, Howell & Price, Little Rock, Ark. (argued), and Steven L. Festinger, Little Rock, Ark., on brief, for appellant.

Fletcher Jackson, Asst. U. S. Atty., Little Rock, Ark. (argued), George W. Proctor, U. S. Atty., and Michael Alexander, Legal Intern, Little Rock, Ark., on brief, for appellee.

Before HEANEY, Circuit Judge, GIBSON, Senior Circuit Judge, and ROSS, Circuit Judge.

PER CURIAM.

Malcolm Eugene Ratliff was convicted pursuant to a jury trial in the United States District Court for the Eastern District of Arkansas [1] of five counts of an eight-count indictment.[2] The jury convicted Ratliff of four counts of making false statements to a bank in violation of 18 U.S.C. § 1014 (1976) [3] and of one count of conspiracy to make false statements in violation of 18 U.S.C. § 371 (1976). Ratliff misrepresented the collateral value and history of pre-World War II German corporate bonds in order to obtain bank loans. Ratliff contends on appeal that the indictment should have been dismissed, as the Government allegedly breached its promise not to prosecute him.

Ratliff also challenges the admission into evidence of the testimony of a German banker with regard to the value of the bonds. We affirm.

In September of 1976, Ratliff, a resident of Memphis, Tennessee, secured a quantity of pre-World War II bonds of the Rhine Westphalia Power Corporation. He testified that he purchased $500,000 face-value of the pre-World War II German bonds for $100,000 face-value Texas general obligation bonds and $20,000 in cash. In November 1976, Ratliff lent the bonds to Carl E. Friend, also a Memphis resident, who used 120 of the bonds as collateral in return for five loans from the First National Bank of Brinkley, located in Arkansas.[4]

The loans were made on November 18 and 23, 1976, and December 7, 13, and 27, 1976. The Government alleged that Friend and Ratliff represented to the bank that the 120 bonds were worth $120,000.[5] In addition, on December 15, 1976, Ratliff sent a false mailgram to the bank, purportedly sent by an official of the Dresdner Bank in Essen, Germany, confirming that the bonds were worth two-and-one-half times face value, a sum approximately ten to twelve-and-one-half times the amount Ratliff said he paid for the bonds.

In 1977, the bank loans went into default. In a meeting with the bank officers concerning the default, Friend and Ratliff falsely stated that the bonds held by the bank for security for the loans had been in and obtained from Friend's grandfather's estate, when in fact both knew that Ratliff had previously obtained the bonds.

---

1. The Honorable G. Thomas Eisele, Chief Judge, United States District Court, Eastern District of Arkansas.

2. Three counts were dismissed by the trial judge prior to submission to the jury.

3. 18 U.S.C. § 1014 (1976) provides in relevant part:

 Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of * * * any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, * * * upon any application, advance, discount, purchase, purchase agree-

ment, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

4. Friend testified that Ratliff was to receive twenty-five percent of the loan proceeds in return for use of the bonds.

5. The trial court dismissed the three misrepresentation counts against Ratliff with regard to the three December loans.

Ratliff was indicted in August 1979. Jury trial was held in November 1979. Carl Edward Friend was granted immunity from prosecution and testified for the Government. The jury found Ratliff guilty of four counts of misrepresentation and one count of conspiracy. Ratliff made post-trial motions for acquittal, arrest of judgment, and for a new trial. On January 7, 1980, the District Court denied these motions in an unpublished memorandum and order. The court sentenced Ratliff to thirty days' imprisonment on the conspiracy count but suspended sentence on the four misrepresentation counts. The court placed Ratliff on probation for five years on each misrepresentation count, to run concurrently. Finally, the court fined Ratliff $2500 for each of the five counts.

*Declination to prosecute*

██ In late 1976, Ratliff was contacted by the Federal Bureau of Investigation (FBI) concerning the source of pre-World War II German bonds that had been circulating in this country, mainly on the East Coast. Ratliff alleges that he refused to cooperate unless he was granted full immunity. In late May 1978, an FBI agent from Memphis relayed to Ratliff an offer made by the United States Attorney in North Carolina stating the conditions to which the United States Attorney would agree in order to procure an interview with Ratliff. The offer was made pursuant to a North Carolina FBI agent's request to interview Ratliff concerning his presence at the Memphis airport when German bonds were delivered. The bonds had previously been used by a New York attorney at a North Carolina bank to obtain a large loan.

The Memphis FBI agent testified that the offer communicated to Ratliff was limited to a declination to prosecute him on any German bond matter in North Carolina. On June 7, 1978, Ratliff met with the agents in Memphis. At the meeting, Ratliff was given a letter from the United States Attorney, declining prosecution, which read:

> This will confirm my conversation on May 31, 1978, with special agent, Otho Allen Ezelle, Jr., [of North Carolina] in which I declined federal prosecution of Malcolm Ratliff of Memphis, Tennessee, regarding his involvement with pre-World War II German bonds in this specific investigation.

The North Carolina agent testified that the letter referred to the North Carolina investigation involving the New York attorney. Ratliff claims that the Memphis agent promised full immunity and that the letter includes a declination to prosecute in all transactions involving pre-World War II German bonds.

The District Court credited the testimony of the FBI agents and found that "the defendant was not granted immunity from this prosecution, nor did he receive any promise or assurance that the investigation or prosecution of his case would not proceed if he cooperated with the Government." We agree with the District Court.

The factual findings of the District Court are to be upheld unless they are clearly erroneous. *United States v. Minnesota Mining and Manufacturing Co.*, 551 F.2d 1106, 1109 (8th Cir. 1977). The District Court chose to credit the testimony of the FBI agents over the conflicting testimony of Ratliff. "[D]eference must be accorded the District Court's ability to observe the demeanor of the witnesses and to weigh the credibility of their testimony." *Id.* Upon a review of the record, we find that the District Court did not err in finding that the U.S. Attorney's declination to prosecute related to only the North Carolina investigation.[6]

---

**6.** Ratliff also claims that even if the declination to prosecute is limited to the North Carolina investigation the conspiracy count should have been dismissed, since the conspiracy with regard to the bonds involved Arkansas, Tennessee, Georgia, New York, and North Carolina. The conspiracy Ratliff was charged with in the indictment was that he and Friend would falsely claim to the Arkansas bank that the bonds used as collateral were obtained from Friend's grandfather's estate. There is no relation between this conspiracy and the facts involving the North Carolina investigation.

*Evidentiary ruling*

Ratliff challenges the admission into evidence of the expert testimony of a German banker and bond examiner, Mintken, with regard to the value of the bonds. Ratliff claims Mintken's testimony was hearsay, in violation of the best evidence rule and of Ratliff's constitutional right to compulsory process. The District Court fully considered this issue in its post-trial memorandum. The question presented was whether the unavailability of a master list of redeemable bonds,[7] compiled by the German government after the war, precluded Mintken's testimony of his valuation of the bonds supplied by Ratliff. The District Court admitted Mintken's testimony, finding:

> The primary factor in this Court's decision to admit Mr. Mintken's testimony despite the absence of the master list is the unique relationship of the list, Mr. Mintken's conclusions regarding potential validity, and the value of the bonds. The issue in the case is the value of the bonds—not their value in some abstract sense, but the value they have in a normal commercial context. It is the Court's perception that the value is determined by Mr. Mintken's conclusions as to underlying validity, not by investigation of the master list or other background records. * * *
>
> This perception leads the Court to conclude that the relevant inquiry concerning a bond's validity ends with a thorough investigation of Mr. Mintken's conclusion and the processes behind it, which may be accomplished by his cross-examination without production of the master list. In this case, * * * the witness who testified to his conclusions was vigorously cross-examined about the background and process behind his conclusions, as well as about the reliability and accuracy of the master list and other records. His testimony regarding background was relevant to the weight and credibility assigned by the jury to his testimony regarding his conclusions, but it did not undermine the admissibility of that testimony. * * *

 We agree with the District Court that Mintken's testimony was not a mere reiteration that Ratliff's bonds were not included on the master list as being valid and outstanding. To the extent that Mintken did testify to the bonds' status on the list, the testimony was admissible under the "catch-all" exception to the hearsay rule. *See* Fed.R.Evid. 803(24); *United States v. Friedman*, 593 F.2d 109, 118–19 (9th Cir. 1979). Mintken was subjected to extensive cross-examination, thus satisfying Ratliff's constitutional right of cross-examination. *See United States v. Williams*, 447 F.2d 1285, 1289–90 (5th Cir. 1971) *(en banc), cert. denied*, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972).

 Ratliff also contends that the District Court erred in not striking Mintken's testimony on the basis that it violated the best evidence rule. *See* Fed.R.Evid. 1002. Since Mintken did not attempt to "prove the content of a writing [the master list]" the rule does not apply herein. In addition, the District Court found the list to be "unavailable" and "not amenable to court

---

7. The bonds were issued and sold prior to the outbreak of World War II. These bonds were due and payable in 1950, but prior to World War II many of the bonds had been purchased by or on behalf of the issuer and held for conservation. During the war, the New York selling agent was precluded from cancelling the German obligations. The German authorities, however, repurchased a considerable amount of the bonds. These uncancelled bonds were stored, among others, in the Reichsbank until they would be redeemed by the issuing corporation. When Berlin was invaded at the end of the war, the Russians plundered the bank, resulting in the recirculation of the bonds. The German government set up an examining system to determine which bonds were valid and redeemable. Only a relative few of the bonds (29 with face value of $29,000) were valid and outstanding obligations as of the date of this trial. The bonds now are redeemable only in Germany. Proof of source, right to possession, and validity must be supplied by those seeking

processes in this country."[8] The best evidence rule does not apply to the list under these conditions. *See* Fed.R.Evid. 1004(2).

Affirmed.

redemption. Mintken is the examiner for the issue of bonds involved in Ratliff's case.

**8.** On appeal, Ratliff does not challenge this factual finding. He does claim that the court erred in not ruling on whether the list was privileged. Whether the master list was privileged or not is but one possible reason for its unavailability. Ratliff has not demonstrated that it is the only reason. The court, in fact, believed that it had no subpoena power over the documents in Germany. In the absence of such a demonstration, we cannot find the court's finding to be clearly erroneous. Nor did the court err in refusing to allow into evidence a booklet, written in the German language, from which Mintken refreshed his memory. The court made the document available to Ratliff and his interpreter. *See* Fed.R.Evid. 612. Considerations of judicial economy and concern over confusing the jury are sufficient reasons for excluding the German notebook. *See* Fed.R.Evid. 403.