**UNITED STATES of America**

v.

**Jerry Lee HARVEY, Defendant.**

**No. 85-6204-Cr.**

United States District Court,
S.D. Florida.

Dec. 24, 1986.

---

Leon B. Kellner, U.S. Atty., S.D. of Florida, Miami, Fla., Thomas L. Fink, Sp. Atty., U.S. Dept. of Justice, Tax Div., Crim. Sec-

tion, Washington, D.C., and Stephen L. Snyder, Asst. U.S. Atty., W.D. Texas, San Antonio, Tex., for U.S.

Leonard A. Sands, of Sands & Moskowitz, and James D. McMaster, of McMaster, Foreman & Miller, Miami, Fla., for defendant.

## ORDER OF DISMISSAL

PAINE, District Judge.

The recommendations of United States Magistrate Ann E. Vitunac have been reviewed together with an independent *de novo* review of the entire record herein. The government's memorandum of objections to the Magistrate's Report and Recommendation has also been studied by the undersigned. On the issues presented by the government in its memorandum the following findings and conclusions are made:

1. Both transactional and use immunity were extended to the defendant and agreed to between the government and the defendant through representatives of the Department of Justice in Alabama.

2. The defendant provided immunized information of a financial nature relating to his drug transactions which surely furnished, at a minimum, leads to the government for the evidence it would use in support of the indictment in this case. The government's evidence has, thereby, been tainted even if it is assumed that the evidence to be presented in support of some or all of the counts in the indictment may be shown to have been obtained from "independent" sources.

3. Only where the government's evidence is not tainted may it be presented during trial where illegally obtained evidence was used to obtain an indictment from a Grand Jury. Having determined that the evidence or leads to the same was tainted it is clear that a basis for dismissal of the indictment is available.

4. While the defendant may not have specifically informed the government that he had committed the tax offenses which are the subject of the instant indictment or anything regarding the content or the preparation of the filing of his tax returns, information regarding his finances as related to his drug deals including particulars related to his income should also be included in the immunity which was extended to him. The knowledge that the defendant failed to report interest from capital gained from illegal drug transactions must also be classified as tainted.

5. While as the government points out in its memorandum, the credibility of the defendant and his motive for testifying in a way favorable to his position can be arguably questioned, the credibility of witnesses, including the defendant, is for the trier of the facts. In this instance that person is the United States Magistrate. The Magistrate's finding that the defendant was extended both transactional and use immunity was based, not only on statements of the defendant, but on the testimony of William Kimbrough, Tom Haas and Patrick Sullivan.

6. Although suppression of the illegally obtained evidence is an alternative remedy which might have been utilized, it is not necessary to proceed with the trial during which the suppression of tainted evidence would surely deprive the government of the totality of its evidence.

Having considered the matter it is the view of this Court that the findings and recommendations of the Magistrate should be and are hereby approved and adopted by this Court. It is, therefore,

ORDERED and ADJUDGED that the indictment is dismissed with prejudice.

## REPORT AND RECOMMENDATION

ANN E. VITUNAC, United States Magistrate.

This cause came before the Court on a Motion for Pretrial Kastigar Hearing (DE32). Defendant's Motion for Pretrial Kastigar Hearing was then supplemented by Defendant, Harvey's Supplement To His Kastigar Motion (DE71). The supplemental motion to Harvey's Kastigar Motion

included within a Motion to Dismiss the Indictment as being the product of tainted evidence. This final motion was predicated on evidence adduced before this Court at Pre-Kastigar Evidentiary Hearings held on October 10th, 17th and 31st of 1986.

The purpose of a Kastigar Hearing is for the Government to show, after an initial burden of the defendant has been met, that the Government did not use evidence that was the subject of an immunity grant (or evidence derived therefrom) to obtain an indictment. The purpose of a Kastigar Hearing is also to show that the Government is not intending to use immunized evidence or evidence derived therefrom during the trial on the subject indictment.

At the initial hearing held by this Court on October 10, 1986, it became evident to the Court that before this Court could determine whether or not to hold a Kastigar Hearing, this Court would have to hold a Pre-Kastigar hearing in order to determine:

1. Was the defendant given immunity?

2. If so, what kind of immunity was the defendant given?

3. What did the defendant say which is subject to the grant of immunity?

These issues had to, of necessity, be resolved before the Court could determine the necessity for a Kastigar Hearing. The issue with respect to the Kastigar Hearing is whether or not the Government would be able to show to the Court that the indictment and the trial evidence with respect thereto is based on evidence separate and apart from the defendant's immunized statement and not derived therefrom.

This Court heard in excess of fifteen (15) hours of testimony from both the Government and the Defendant to determine the Pre-Kastigar issues. This Court finds that the defendant met his initial burden of showing that the defendant was given some kind of immunity which would require this Court to make both factual and legal determinations with respect to the effect of that immunity grant on his present prosecution for tax evasion.

## FACTS

The facts in this case are far from clear. The main reason that the factual determination is particularly difficult is that the Government failed to memorialize its agreement with the defendant, Harvey, in any written form. Not only did the Government lawyers in Alabama not have a written contract of immunity with the defendant, Harvey, the Southern District of Florida failed to memorialize any agreement with the defendant, Harvey as well. Further, the agents charged with the responsibility of "debriefing" Harvey failed to make any written reports or keep any notes whatsoever concerning the matters about which they spoke to the defendant, Harvey. Additionally, the Drug Enforcement Agents never documented that such a meeting ever took place. This Court will now state its factual findings in greater detail.

## FACTUAL FINDINGS

The defendant, Jerry Lee Harvey, was arrested the 13th day of June 1980, in Mobile County in the Southern District of Alabama. He was arrested along with several other persons and charged in a methaqualone importation case. The defendant, Harvey, hired legal counsel to represent him on that case. That lawyer was Tom Haas.

According to the testimony of Tom Haas at the Pre-Kastigar Hearing, the case against Harvey was unbeatable and therefore contrary to his normal practice he, Tom Haas, advised Harvey to cooperate with the Government and attempt to negotiate a deal for some consideration with respect to the charges pending against him.

According to the testimony of William Kimbrough, the U.S. Attorney for the Southern District of Alabama, the defendant, Harvey, in fact, negotiated a deal with respect to the Mobile case. According to Kimbrough, who testified at the Pre-Kastigar Hearing, the Southern District of Alabama did not need the defendant, Harvey's testimony or cooperation with respect to its

own case. The case against the defendant, Harvey, was characterized as a "slam dunk" case which according to Harvey's own lawyer, appeared to be indefensible. Kimbrough testified the only reason for offering a negotiation to the defendant, Harvey, was to facilitate an investigation pending in the *Southern District of Florida.* According to the testimony of Kimbrough, his assistant, Ruddy Favre, now deceased, personally spoke with Assistant United States Attorney, Patrick Sullivan, and reached the agreement with Harvey based on conversations with Patrick Sullivan.

Tom Haas and William Kimbrough, who was at the time of the agreement the U.S. Attorney in the Southern District of Alabama, testified the deal negotiated with Harvey was that Harvey would not be prosecuted for anything about which he told the Government nor would anything he said be used against him.

It is appropriate at this time to quote from the transcript of the Pre-Kastigar Hearing from the testimony of both Kimbrough and Haas. This is necessary because the deals struck between Harvey and various components of the United States Government were never reduced to writing by anyone in 1980, when they made the bargain.

To determine the nature of the actual bargain struck between Harvey and the Government in 1980, the defense called Tom Haas, Harvey's defense attorney to the stand. The question and answers are set out herein:

Testimony taken from the transcript of the hearing of October 17, 1986. (Page 11 line 6 thru page 13 line 6)

Q   by Leonard Sands

A   by Tom Haas

Q   What was the bargain that was ultimately struck with the two of them?

A   Once it had been understood that he might be able to supply these things, the understanding I had with Ruddy and Billy was that nothing that Jerry Harvey said to them, or any agent on the Government would ever at any time be used against Jerry Harvey.

Q   And What does that mean, "would ever be used against Jerry Harvey"?

A   That he wouldn't be prosecuted on the basis of what they found out from him.

Q   What instructions or advice did you give Jerry Harvey prior to his attending this meeting at the Sheraton?

A.   Well, I told him just what I just said, and I remember that Jerry was very skeptical about that. He didn't seem to trust anybody, and maybe he didn't trust me either. Really, he didn't know me; anything about me. I was a small town lawyer in a small town to him, and I don't recall who had referred him to me. I usually try to find that out, particularly in drug cases, because I don't want to get in a situation where I am getting paid by somebody else.

I know that he was skeptical. I know he didn't trust anybody, and I had to literally force him to comply. I said, "I know these people, U.S. Attorney, and Assistant U.S. Attorney." I said, "I would stake my life on their honor and veracity."

I was talking about United States Attorney, Mr. Kimbrough; the Assistant who served under all types of Democrats, and Republicans, and that is the late Ruddy Favre. That is who I was talking about.

Q   Favre was a career prosecutor with the U.S. Attorney's Office?

A   Yes. One of the best I ever saw; and I told Jerry the only way he could lose this plea bargain deal was for him to lie; deliberately withhold pertinent information; be duplicitous in any way. I said, "You must be open, frank, and complete in what you say. You must not tell them something that is not true, or leave out something that is pertinent and material."

Q   At any time did anybody from the Government ever communicate to you Jerry Harvey had not fulfilled on his end

to be candid, and disclose his knowledge, and activities?

A No. That was the original skepticism spoke of. As I recall at the meeting at the Sheraton, some of the agents were skeptical. The Agent—and perhaps I should mention this—the agents were not a part of my agreement with Ruddy and Billy, and I got the impression that some or most of those agents, particularly one of them, were not particularly happy with the fact that they made this quaalude bust on Jerry, and he might get out of it, so to speak; and they were kind of hard on Jerry, and primarily it appeared for that reason.

Testimony taken from transcript of the hearing of October 17, 1986. (Page 26 line 3 thru page 27 line 9) This is cross examination of Haas by Tom Fink, Attorney for Government.

Q And I want to be sure I understand, the reason this agreement was not reduced to writing was basically because you felt that you had a relationship with Ruddy Favre, and you could trust him; isn't that correct?

A Mr. Fink, I made agreements, some with Billy. I fight most of my cases, but I guess I have made a dozen agreements of one kind or another with the late Ruddy Favre, and none of them were ever reduced to writing. I would have been insulted if he asked me to put something in writing, and I am certain he would have been insulted if I asked him.

It was not necessary to put anything in writing with a man of this type.

Q Mr. Haas, in terms of protecting your client against future prosecution, in other districts, whether it is California, Chicago, whereever, in terms of binding the Government to an agreement across the Country, isn't that the kind of thing you would want to get in writing from United States Government?

A From some United States Attorneys, yes. From some Assistants, yes. From some of the folks from your division Mr. Fink, yes.

From Billy Kimbrough, or Ruddy Favre, no; and I will say for most of the U.S. Attorneys in Mobile, Alabama, most Assistants, Democrat, or Republican, I don't have anything in writing. I know the ones you can't trust. You learn that the hard way. There are not many, thank God.

Q In terms of binding Mobile, Alabama, you were not concerned?

A Well, they speak for the Department of Justice. They don't just speak for themselves. I am not talking about personal agreements. This is a plea bargaining between the United States Department of Justice, and one little defendant.

As to United States Attorney Kimbrough's recollection of the deal made with Harvey the Court notes the following testimony:

Testimony taken from the transcript of the hearing of October 10, 1986. (Page 32 line 25 thru page 33 line 23 & first word of line 24)

Q by Leonard Sands

A by William Kimbrough

Q Okay. Is it your understanding that the agreement between your office and Mr. Haas, Harvey's attorney, was that anything Harvey disclosed about himself, and his own activities, would never be the subject of a prosecution involving Jerry Harvey?

He wasn't going to be stepping into a trap, in effect?

A Yes.

Q I will show you—

A Let me put it this way: I want to be fair to the Government, and I want to be fair to Mr. Harvey. Tommy Haas is a good lawyer. Tommy Haas practiced law longer than I have, and he practiced criminal law.

It is beyond the imagination, my imagination, to think that Tommy didn't have that agreement with Ruddy. Now, what his agreement was with South Florida, I don't know. I do not know of any—I had no personal contact with South Florida about the matter, but I cannot conceive

of Tommy allowing a client to enter into a conversation without that understanding, and I cannot conceive that he would have left his client to continue talking to DEA, which I think that he did; but as far as, you know—I read Ruddy's letter where he refers to 6001 immunity. There was never any discussion with me about that. I do not know of any writing that memorialized his understanding with Pat Sullivan.

*The only reason we did it was to accommodate South Florida.*

Further on in the testimony of Kimbrough, (at page 37 line 10 thru page 38 line 4), Mr. Sands asked Mr. Kimbrough:

Q  In return for Harvey's furnishing information, what was he to receive?

A.  I was to dismiss the indictment against him.

Q  Do you know whether or not any—

A  And I would not prosecute him for anything he said; and I would not use anything he said as a means of going beyond this agreement to try to stir up trouble for Harvey.

Q  At that time as United States Attorney, you were speaking for yourself, and Southern District of Florida?

A  I can't say that. It was certainly my understanding `that somebody had touched base with South Florida who wanted the information, and I assumed, and I continued to assume that nobody would have—

I certainly would not have asked Mr. Harvey to make a total disclosure had I thought that in doing so, I, you know, turned him loose to prosecution in some other district. I have no personal knowledge of that. That is all I am saying. That is not the way we operated, I assure you. We tried to treat everybody as human beings, although we tried to put some of them in the penitentiary. (..... Page 38 line 9 thru page 39 line 5).

THE COURT: I need to interrupt you, Mr. Sands. Mr. Kimbrough, you made the statement that you would not have prosecuted him for anything that he told you about.

Now, there are all different kinds of immunities, and we have been discussing that. We have been discussing transactional immunity versus use immunity.

If in telling you about all drug-related murders about which he had knowledge, Mr. Harvey told you that he killed somebody in Mobile, Alabama, pursuant to this agreement, and this letter, and your understanding of this, could you prosecute him for that murder?

THE WITNESS: I don't know. I probably wouldn't have.

THE COURT: Could you use his statement or facts that he gave you in the statement in building of the murder case?

THE WITNESS: No, because it would be derived from the statement he gave.

THE COURT: So in your interpretation for certain you gave him use immunity pursuant to this agreement, but you don't know whether or not you gave him transactional immunity?

THE WITNESS: That is right.

(..... Page 39 line 19 thru page 40 line 4).

Q  Was it part of that plea bargain that Harvey would not be prosecuted for any information he provided about his own activities?

A  Well, I think my letter states what I understood. You know, what I am saying is that as far as my district was concerned, that is certainly what I intended, and what I did.

I assumed perhaps erroneously that some agreement had been formalized with Pat Sullivan in Florida; but it was certainly my understanding that, you know, I did not intend, you know, to have the man make a disclosure and turn around and charge him on the basis of disclosures he made.

This Court also considered the testimony of the defendant himself, Jerry Lee Harvey, who testified at the Pretrial Kastigar Hearing. According to Mr. Harvey, he and his lawyer Tom Haas worked a deal with

the Government Attorneys in the Southern District of Alabama for him to assist Pat Sullivan, Assistant United States Attorney, in the Southern District of Florida, in return for which the case against him in Mobile would be dropped and that he would not be prosecuted for anything about which he told investigators from the Drug Enforcement Administration.

According to the testimony of the defendant, Jerry Harvey, both William Kimbrough and Ruddy Favre had numerous conversations with Assistant United States Attorney, Patrick Sullivan, concerning the type of information which Pat Sullivan wanted from the defendant Harvey in the form of a proffer which related to the deal worked out by Mobile for the benefit of the Southern District of Florida.

Testimony taken from the transcript of the hearing of October 17, 1986. (Page 61 line 21 thru page 62 line 13).

Q by Leonard Sands

A by Jerry Lee Harvey

Q As a result of those conversations, was it your understanding you had an agreement with the U.S. Attorney's Office in the Southern District of Alabama?

A I knew I did. Mr. Kimbrough, and Mr. Favre told me, and Tom Haas told me.

Q What did they tell you your deal was? What were you supposed to do?

A I was supposed to tell them everything I knew about drug trafficking, people involved, how it took place, what happened to the funds, how you would register airplanes fictitiously. Anything I knew from 1975, and everything I had done from '75 up to the present time.

Q And what was the Government's obligation to you in return for your cooperation?

A They agreed nothing I ever give them would be used against me, nor would any U.S. Attorney's Office seek to prosecute me for anything; that I was just getting a clean walk, and I should stay on the Government's side and help them.

During the preliminary negotiations between Mr. Kimbrough, Mr. Harvey and Mr. Favre, the United States Government represented by Patrick Sullivan, Assistant United States Attorney from the Southern District of Florida, according to Kimbrough, called Kimbrough's office in Mobile and asked that the U.S. Attorney's Office in Mobile seek a proffer from the defendant, Harvey, with respect to his knowledge of drugs and corruption within the Southern District of Florida, see defense exhibit #1.

The defendant also submitted into evidence various other documents which reflect that Jerry Harvey had reached an agreement with the United States Government after having rendered assistance to the Drug Enforcement Administration and specifically to Assistant United States Attorney Pat Sullivan. Based on those letters, which are defense exhibits, Mr. Kimbrough moved to dismiss the indictment against Jerry Harvey in the Southern District of Alabama, and that indictment was, in fact, dismissed. Included within the letters in evidence was a letter from Assistant United States Attorney, Patrick Sullivan, to Rina Cohan, a prosecutor in the State of Florida, asking for consideration on behalf of Harvey because of his assistance which he rendered to the United States Government and specifically the Drug Enforcement Administration. Reference is also made in a letter, by Allan Pringle of the Drug Enforcement Administration, to Mr. Kimbrough concerning how Mr. Harvey had fully cooperated with the Drug Enforcement Administration and with Patrick Sullivan.

It would seem reasonable then that we could look to the testimony of Assistant United States Attorney, Patrick Sullivan, to shed some light on the immunity agreement reached with Jerry Lee Harvey. Other than being able to recognize his own signature at the close of a letter to Rina Cohan recommending leniency for Jerry Lee Harvey, Mr. Sullivan appears to neither recognize nor remember anything concerning his involvement with Jerry Lee Harvey. Indeed, on cross examination by

Mr. Sands of Patrick Sullivan, he failed to recall having used Jerry Harvey as a witness in a criminal case in which he, Patrick Sullivan, was the trial prosecutor. This case occurred some three to five years prior to Jerry Harvey's arrest in 1980, in Mobile. Mr. Sullivan has no recollection of having spoken with Ruddy Favre or Mr. Kimbrough or having made any negotiations on behalf of Jerry Harvey.

Mr. Sullivan's memory was not refreshed by defense counsel showing him the reported opinion of the case in which he, Sullivan, used Jerry Harvey as a witness. The case is cited as *U.S. v. Rodriguez*, 585 F.2d 1234 (5th Cir.1978).

Another attempt was made to refresh Mr. Sullivan's recollection as to having negotiated on behalf of Jerry Harvey.

We again refer to the testimony taken from the transcript of October 31, 1986. (Page 12 line 12 thru page 15 line 17.)

Q Do you ever recall writing any letters on behalf of Jerry Harvey in connection with either his case in Mobile, or a case pending at or about the same time?

A No. I don't.

Q In the state courts in Florida?

A No.

MR. SANDS: I have made an extra copy for both yourself, and Mr. Fink of a letter which purports to be dated September 30th, and I have asked the Clerk to have it marked at this time.

THE COURT: Mark it, Defendant's 9.

(Defendant's Exhibits 8 and 9 marked for identification.)

BY MR. SANDS:

Q Mr. Sullivan, the Clerk placed a letter there. Would you turn to the second page and tell us if you recognize your signature?

A That is my signature.

Q Would you look at the letter and tell me when you are finished.

A Read the letter?

Q Yes, sir.

THE COURT: Read it into the record, please.

THE WITNESS: Addressed to Miss Rina Cohan, C-o-h-a-n, Assistant State Attorney, the address in miami; Re: Jerry Lee Harvey, September 30, 1980. "Dear Miss Cohan, with reference to the above defendant, please be advised that Mr. Harvey has been acting as a confidential informant for the United States Drug Enforcement· Administration for the past several months. His activities have resulted in the arrest of 8 Cuban-Colombian drug traffickers, and seizure of $35,000. The traffickers have been indicted for multiple drug offenses and will shortly proceed to trial with Harvey as the main Government witness against him. Harvey's own indictment in Mobile, Alabama will be dismissed in consideration for his cooperation with the Miami Drug Enforcement Administration. I was advised as this date by the United States Attorney, Billy Kimbrough, at the conclusion of the trial of Harvey's co-defendants now underway in Mobile, the pending indictment against Harvey will be dismissed by the Government.

For these reasons, I respectfully request that State charges of probation violations against Harvey likewise be dropped. Thank you for your prompt and friendly attention to this matter. Sincerely United States Attorney, Atlee Wampler, III, by Michael P. Sullivan."

BY MR. SANDS:

Q Is that your signature?

A It definitely is my signature.

Q Now that you have seen the letter, and read it, is the recollection refreshed as to the subject matter on the letter?

A I don't remember writing Miss Cohan.

Q Now that you have read it, you have no independent recollection?

A I still don't.

Q Okay. The letter refers to a conversation with Mr. Kimbrough?

A It does.

Q Now seeing that, do you recall at least there must have been a telephone conversation?

A There must have been.

Q  Do you have any recollection now that you have seen the letter to help jog you memory?

A  No.

Q  Now seeing the letter, and reference to conversation with William Kimbrough, do you have any recollection of maybe speaking to somebody in his office?

A  I don't have any memory of negotiating with the Southern District of Alabama on behalf of Jerry Lee Harvey and his pending case there, and in Mobile.

Q  I am embarrassed to ask this question—

A  I am sure I am embarrassed to answer it, too.  Go ahead.

THE COURT: So far I see why.

BY MR. SANDS:

Q  If you wrote the letter, it must have been true at the time you wrote it?

A  I am sure it was.

Q  You wrote this letter in your official capacity?

A  Yes.

Q  On behalf of the U.S. Attorney's Office in this district?

A  Correct.

Q  It was in concert or agreement with some arrangement or agreement you participated in with the U.S. Attorney's Office in Mobile, in conjunction with the office here in South Florida?

A  I would't have done it otherwise.

Based on the testimony of William Kimbrough, Tom Haas, Jerry Lee Harvey, and Patrick Sullivan, this Court find factually that the defendant Harvey was, in fact, given not only use immunity for anything about which he told Drug Enforcement Administration Agents pursuant to that agreement, but also transactional immunity.  The next issue becomes then, what did the defendant say which is the subject of the grant of the immunity.

After reaching an agreement with the Government lawyers in Mobile, Mr Haas accompanied his client, Harvey, to a hotel room at the Sheraton where he was debriefed by two agents of the Drug Enforcement Administration.  At this juncture, it is impossible for the Court to know what Mr. Harvey told the agents at this meeting.  The responsibility for recording the information elicited at that meeting was certainly on the Government.  However, as previously stated in this Order, the two direct witnesses from the Government who debriefed Harvey at this time state that they have absolutely no drug enforcement reports, notes or memorandum which even reflect that such a meeting took place much less give the details of that meeting.

The best that can be said as a summary of the evidence or statement made by Harvey to the Drug Enforcement Agents at that meeting is that Harvey told them all about his drug dealings in which he had been involved prior to his arrest in June of 1980, and including the arrest of 1980.  This Court specifically finds from the facts adduced at the hearing that the defendant Harvey also divulged to the Drug Enforcement Administration his financial dealings with respect to his illegal drug deals.

This meeting at the Sheraton was held pursuant to the Mobile negotiations but for the benefit of the Southern District of Florida.  The answers elicited from the defendant were from questions propounded by the Southern District of Florida and therefore the Southern District of Florida is bound by the negotiations.

### FINDING OF LAW

The Government first argued factually that this defendant had not been given any immunity whatsoever.  The Government conceded at the second hearing that the defendant, Harvey, had in fact, been given some kind of use immunity.  The Government argues in its Memorandum of Proposed Findings of Fact of Law that a United States Attorney does not have the power to provide an individual with immunity from prosecution for crimes occurring and indicted in other jurisdictions.  The Government also argues that transactional immunity has been repealed and that the Government could not give Harvey anything but use immunity by virtue of 18 USC Section 6001 and 6002.  It is the Government's

contention that Congress repealed the power to grant transactional immunity in order to limit the scope of federal immunity.

That the Government, in this case, made a poorly worded, loose and perhaps bad bargain is certainly not open to question. However, a bargain nonetheless was made and that bargain is enforceable. See *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). See also *United States v. Sanderson*, 498 F.Supp. 273 (1980). (In *Sanderson*, the Government also made a bargain with the defendant though not a formal grant of statutory immunity under 18 U.S.C. Section 6001 *et. seq.*) This case also dealt with the enforceability of the agreement that had to do with promises of immunity or leniency. The Court at page 277 stated:

> In view of the fact that a Government Attorney drafted the terms of the agreement and because a waiver of substantial constitutional rights was made in reliance thereon, this Court is of the opinion that the ambiguity arising over the defendant's obligation should be construed against the Government.

The Court went on to say:

> Because the Court has found that the Government received the benefit of its bargain with the defendant, the Court must in turn ensure that the defendant received the promised immunity. The Court in *Sanderson* went on to dismiss the indictment as the only means available to the Court of fulfilling the promise of the prosecutor and protecting the integrity of the judicial system.

The argument of the Government that Congress has precluded the granting of transactional immunity is not well taken. Though some Courts have called the use of pocket immunity or informal immunity as "damnable" practices and illegal practices (See *United States v. Kilpatrick*, 594 F.Supp. 1324 (1984) (Wherein Mr. Snyder, who is trial counsel in the case at bar, was the attorney who granted the pocket immunity in that case), the immunity bargained for must still be enforced by the Courts.

What the Government confuses with respect to immunity is the Court's power under 18 U.S.C. 6001, *et seq.* to force an *unwilling* defendant to testify, versus the Government's virtually unbridled discretion to plea bargain with any defendant as to any terms offered by the Government. With respect to 6001 immunity, the Court can *compel* a defendant to testify, but can *only* grant him use immunity and not transactional immunity. On the other hand, the executive branch of the government can grant transactional immunity in the form of a bargain and does not need the blessing of the Court to do so. The Court has no authority, except rare circumstances, over bargains made by the Government where the defendant is a *willing* and bargaining participant in the negotiations.

Since this Court has found that the defendant, Harvey, had both use immunity and transactional immunity for Pre-September 1980, drug dealings and financial dealings with respect to the drug dealings, the Court must next decide what effect, if any, that finding has on the pending indictment against Jerry Lee Harvey.

At the Pre-Kastigar Hearing Steven L. Snyder, trial counsel, testified on behalf of the Government as to the nature of the case against Harvey. Snyder testified that the evidence presented to the grand jury which returned this indictment was that the probable source of the income for the tax evasion charges was drug dealing, eighty per cent occurred in 1978 and 1979, and the basis for the evasion of the later tax years was the interest earned on that money. This Court finds that tainted evidence, evidence for which the defendant received both use and transactional immunity, was presented before the grand jury which returned the indictment against him. (See copy of the indictment attached to this Order.)

Based on the factual findings set out above and the legal findings of this Court, this Court respectfully submits to the District Court that the indictment against the defendant, Jerry Lee Harvey, be dismissed.

This Court finds that the drug related activity which formed the basis of the indictment as the likely source of the funds which gave rise to the unreported interest income is inextricably tied to the ill-advised and poorly coordinated grant of immunity to the defendant Harvey.

The parties have ten (10) days from the date of this Report and Recommendation to file their objections, if any, to the Honorable James C. Paine, United States District Court Judge.

DONE AND SUBMITTED this the 28th day of November 1986, at West Palm Beach in the Northern Division of the Southern District of Florida.

### EXHIBIT 1

*U.S. Department Justice*

*United States Attorney*

Southern District of Alabama

July 15, 1980

Mr. Thomas M. Haas
Attorney at Law
255 St. Francis St.
Mobile, AL 36602

   Re: *Jerry Lee Harvey*

Dear Tom:

In reference to our conversation concerning your client, Jerry Lee Harvey, it will be appreciated if you would have him reduce to writing, preferably, a proffer of evidence he could give in connection with the following matters:

1) All facts and circumstances relative to the case of *United States v. Harvey, et al.,* pending in the Southern District of Alabama.

2) All facts including names, places and dates of other drug matters with which he is familiar.

3) All drug-related murders of which he has knowledge and information with names, dates and places.

4) All facts to support his allegations that Agents of the DEA are involved in illegal activities in the Miami/Ft. Lauderdale area, and

5) All facts to support his allegations that Assistant U.S. Attorneys are involved in illegal activities in the Miami/Ft. Lauderdale area.

Your cooperation is appreciated.

      Yours very truly,
      /s/ Billy
      W.A. Kimbrough
      United States Attorney

### EXHIBIT 2

26 USC 7201

26 USC 7206(1)

### INDICTMENT

The Grand Jury charges that:

### COUNT I

On or about April 15, 1979, and on diverse dates thereafter up to and including January 17, 1984, in the Southern District of Florida, the defendant,

### JERRY LEE HARVEY,

a resident of the Southern District of Florida, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1978 by concealing and attempting to conceal the receipt of taxable income in the Southern District of Florida, by: "laundering" unreported taxable income from the Cayman Islands to the United States, destruction of records reflecting the receipt and disposition of unreported taxable income, making false material statements and documents to a grand jury, and other means; and by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed, a false and fraudulent U.S. Individual Income Tax return, Form 1040, which was filed with the Internal Revenue Service, wherein he stated that his taxable income for said calendar year was the sum of $17,203 and that the amount of tax due and owing thereon was the sum of $4,859,

whereas, as he then and there well knew and believed, his taxable income for said calendar year was substantially greater than $17,203, upon which said additional taxable income he owed to the United States of America an income tax substantially greater than $4,859.

All in violation of Title 26, United States Code, Section 7201.

## COUNT II

On or about April 15, 1980, in the Southern District of Florida, the defendant,

### JERRY LEE HARVEY,

a resident of the Southern District of Florida, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1979, by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service, wherein he stated that his taxable income for said calendar year was the sum of $20,342 and that the amount of tax due and owing thereon was the sum of $4,947, whereas, as he then and there well knew and believed, his taxable income for said calendar year was substantially greater than $20,342, upon which said additional taxable income he owed to the United States of America an income tax substantially greater than $4,947.

All in violation of Title 26, United States Code, Section 7201.

## COUNT III

On or about April 15, 1981, in the Southrn District of Florida, the defendant,

### JERRY LEE HARVEY,

a resident of the Southern District of Florida, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1980, by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service, wherein he stated that his taxable income for said calendar year was -0- and that the amount of tax due and owing thereon was -0-, whereas, as he then and there well knew and believed, his taxable income for said calendar year was substantially greater than -0-, upon which said additional taxable income he owed to the United States of America a substantial amount of income tax.

All in violation of Title 26, United States Code, Section 7201.

## COUNT IV

On or about April 15, 1982, in the Southern District of Florida, the defendant,

### JERRY LEE HARVEY,

a resident of the Southern District of Florida, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1981, by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service, wherein he stated that his taxable income for said calendar year was the sum of $14,686 and that the amount of tax due and owing thereon was the sum of $4,211, whereas, as he then and there well knew, his taxable income for said calendar year was substantially greater than $14,686, upon which said additional taxable income he owed to the United States of America an of income tax substantially greater than $4,211.

All in violation of Section 26, United States Code, Section 7201.

## COUNT V

During the calendar year 1982, the defendant,

### JERRY LEE HARVEY,

a resident of the Southern District of Florida, had and received a taxable income of approximately $393,829; that upon said taxable income he owed to the United States of America a substantial amount of income tax ; that he was required by law on or before April 15, 1983, to make an income tax return to the Internal Revenue Service, and to pay such income tax; that well knowing the foregoing facts, the defendant JERRY LEE HARVEY, on or about April 15, 1983, in the Southern District of Florida, did willfully and knowingly attempt to evade and defeat the said income tax due and owing by him to the United States of America for said calendar year: by failing to file any such income tax return with the Internal Revenue Service; failing to pay to the Internal Revenue Service any such income taxes; and concealing and attempting to conceal from all proper officers of the United States of America, his true and correct taxable income.

All in violation of Title 26, United States Code, Section 7201.

## COUNT VI

On or about April 15, 1981, in the Southern District of Florida, the defendant,

### JERRY LEE HARVEY,

a resident of the Southern District of Florida, did willfully and knowingly make and subscribe to a U.S. Individual Income Tax Return, Form 1040, which was verified by a written declaration that it was made under penalties of perjury and was filed with the Internal Revenue Service, which said U.S. Individual Income Tax Return he did not believe to be true and correct as to every material matter in that on Schedule B, Part III—Foreign Accounts and Foreign Trusts—Number A of the said return, it was checked that the defendant, JERRY LEE HARVEY, did not at any time during the tax year have an interest in or a signature or other authority over a bank account, securities account, or other financial account in a foreign country; whereas, as he then and there well knew and believed, he had during the tax year an interest in or a signature or other authority over a bank and other financial account located in a foreign country, that is, the Bank of Nova Scotia, Cayman Island Branch, Georgetown, Grand Cayman Island, British West Indies.

All in violation of Title 26, United States Code, Section 7206(1).

A TRUE BILL

/s/ James H. Macdonald
FOREPERSON

/s/ Leon B. Kellner
LEON B. KELLNER
United States Attorney

/s/ Richard H. Kamp
RICHARD H. KAMP
Assistant U.S. Attorney
Chief, Northern Division

/s/ Steven L. Snyder
STEVEN L. SNYDER
Special Assistant U.S. Attorney

EXHIBIT 3

ESTIMATED TRIAL TIME

CERTIFICATE OF TRIAL ATTORNEY

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the indictment/information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 18, U.S.C. § 3161.

3. This case will take 7 days for the parties to try.

4. (Check the appropriate category)

    _____ I        0 to 5 days
      X    II      6 to 10 days
    _____ III    11 to 20 days
    _____ IV    21 to 60 days
    _____ V     61 days and over

5. Has this case been previously filed in Court? (Yes or No) __No__

If yes, Judge: _____. (Attached copy of Case No. _____, Attached Dispositive Order.)

/s/ RICHARD H. KAMP
ASSISTANT U.S. ATTORNEY